UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PNMR SERVICES COMPANY,

      Plaintiff,

vs.                                   No. CIV_____

MARKETSPHERE CONSULTING, L.L.C.

      Defendants.

**COMPLAINT FOR FRAUDULENT INDUCEMENT, FRAUD,
VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES
ACT, NEGLIGENT MISREPRESENTATION, NEGLIGENCE,
BREACH OF CONTRACT, BREACH OF COVENANT OF GOOD FAITH
AND FAIR DEALING, AND BREACH OF WARRANTIES, AND JURY DEMAND**

Plaintiff PNMR Services Company ("PNM"), by and through its undersigned attorneys, for its Complaint for Fraudulent Inducement, Fraud, Violations of the New Mexico Unfair Trade Practices Act, Negligent Misrepresentation, Negligence, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Breach of Warranties, states as follows:

PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff PNMR Services Company ("PNM") is a New Mexico corporation with its principal place of business in Bernalillo County, New Mexico.

2.      Upon information and belief, Defendant MarketSphere Consulting, L.L.C. ("MarketSphere") is a Delaware limited liability company with its principal place of business in Kansas City, Missouri.

3.      The amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiff

1

and Defendant.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

4.       Venue is proper in the District of New Mexico based on 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions given rise to the claims occurred in this district.

5.       This Court has personal jurisdiction over the Defendant based on its transaction of business in this state and its commission of tortious acts in this state pursuant to NMSA 1978, § 38-1-16 and the Defendant has sufficient minimum contacts with this state to subject it to personal jurisdiction in this forum.

## FACTS

6.       On or about January 12, 2009, PNM and MarketSphere entered into a contract entitled "Services Agreement With Individual Task Authorization" (hereinafter referred to as the "MSA") pursuant to which MarketSphere agreed to perform certain services for PNM in exchange for consideration.  (Exhibit A hereto.)

7.       Pursuant to Section 31 of the MSA, the parties agreed that venue for any suit to enforce the MSA would be limited to the state or federal courts of the State of New Mexico, and that the MSA would be governed and interpreted under New Mexico law.

8.       Section 23 of the MSA provides for mandatory arbitration of disputes, but only for disputes where the aggregate amount of the claim is less than $100,000.00. The aggregate value of PNM's claims at issue in this Complaint substantially exceed $100,000.00.  This section also calls for mediation of disputes between the parties. Mediation failed in this case.

9.      Pursuant to Section 1 of the MSA, the services to be performed by MarketSphere for PNM were to be specified in an Individual Task Authorization ("ITA").

10.     Also on January 12, 2009, PNM issued ITA-01, which was signed by MarketSphere on January 13, 2009.  (Exhibit B hereto).  As more fully described in ITA-01, MarketSphere agreed to design, develop and deliver to PNM fully tested and in production Oracle Financial Planning Software by June 5, 2009, (also known as Essbase 11 and Hyperion Financial Planning 11 software) hereinafter referred to as ("Hyperion").  Under ITA-01, between June 8, 2009 and July 31, 2009, MarketSphere agreed to train PNM to use the newly installed Hyperion software.  As further described in ITA-01 and Section IV of Exhibit 1 to ITA-01, MarketSphere was to be compensated based on actual time, materials, and expenses incurred with a ceiling price of $410,930.00. Finally, ITA-01 specified that all services to be provided by MarketSphere would be completed by July 31, 2009.

11.     PNM compensated MarketSphere in accordance with the requirements of ITA-01.  MarketSphere, however, failed to design, develop and deliver to PNM fully tested, in production Oracle Financial Planning Software by the date required by ITA-01.

12.     By June 2009, it became clear to PNM that MarketSphere would not complete its obligations under ITA-01 by the agreed deadlines.  For example, Hyperion prototype screens had not been shown to PNM and "Systems" and "UAT" testing had not been started.  When MarketSphere set up a demonstration for PNM the Hyperion software did not perform as required by the MSA and ITA-01.  Because of this failure the agreed user training could not begin within the specified training period.

13.     After negotiations in June and early July between PNM and MarketSphere, PNM agreed to extend MarketSphere's contract at a fixed price to complete the project.   PNM prepared a list of requirements from ITA-01 that MarketSphere had not completed and with MarketSphere's consent, incorporated them into a new fixed price ITA, ITA-02 (also under the MSA).  Prior to PNM signing ITA-02, PNM senior representatives, Don Tarry and Sheila Clinton, spoke to Rocky Williams, MarketSphere's Project Manager, about whether MarketSphere could get the listed requirements done, i.e., produce a fully tested and in production Oracle Financial Software by September 15, 2009.  Mr. Williams told them that MarketSphere, "was so close" to completing the work, that it worked on their laptop and that he was "absolutely confident" that MarketSphere could complete the contract by September 15, 2009.

14.     Relying on Mr. Williams representations, on July 17, 2009, PNM entered into ITA-02 with MarketSphere (Exhibit C hereto) which extended the completion date to September 12, 2009, listed what MarketSphere failed to do under ITA-01 and changed the manner of compensation for MarketSphere to a fixed price of $558,755.00 plus travel and expense.   PNM compensated MarketSphere in accordance with the requirements of ITA-02.  However, MarketSphere again failed to deliver to PNM a fully tested, in production Oracle Financial Planning Software per ITA-01 and ITA-02.

15.     In August 2009, when it again became apparent that MarketSphere was not going to meet its obligations under the MSA, ITA-01 and ITA-02, PNM contracted with the InfoCrossing, Inc. and Cognizant Technology Solutions ("Cognizant") firms to review and "optimize" the failed work of MarketSphere and deliver to PNM a fully tested, in production Hyperion.  On August 11, 2009, in conjunction with retaining InfoCrossing,

4

Inc. and Cognizant, PNM entered into ITA-03 (Exhibit D hereto) with MarketSphere because PNM needed the MarketSphere "Developer" who had done the work under ITA-01 and ITA-02, to explain her development work to InfoCrossing, Inc. and Cognizant so that they could understand what she had done and could figure out how to correct or redo this work.

16.   InfoCrossing Inc.'s Technical Subject Matter Expert ("SME") Neal Cawi found MarketSphere's development work defective because it was overly complex, often improperly copying formulas from PNM's old Essbase 7, causing multi-hour run times and often calculating the wrong result.  Since MarketSphere's design document failed to give proper design direction, Cawi had to redesign Hyperion in order to complete the installation.  Cognizant also found the "design" defective and had to redo MarketSphere's proposed Planning Screens (also known as Web Forms).

17.   PNM paid MarketSphere consistent with ITA-03 requirements.

18.   In the fall and winter of 2009 and 2010, Carl Yost, Partner, of MarketSphere met with PNM and suggested solutions for its failure to deliver Hyperion, but did not supply any employee or agent who actually fixed any of the problems. MarketSphere employees were invited to meetings in the first half of 2010 with InfoCrossing, Inc., Cognizant and PNM, and sometimes these employees attended but never actually fixed their defective work or refunded to PNM money for their defective work.

19.   PNM spent in excess of One Million Dollars ($1,000,000) to fix MarketSphere's defective work and PNM employees spent over 5,000 hours working with InfoCrossing, Inc. and Cognizant to fix MarketSphere's defective work.

20.     In reliance on continuing misrepresentations about how close the project was to completion and based on the ongoing assertions of expertise by MarketSphere the competence of MarketSphere to complete the work, in early 2010, PNM entered into 3 agreements with MarketSphere called Sprints 1 through 3 (Exhibits E through G hereto) pursuant to which MarketSphere would provide additional software development and optimization services to PNM in exchange for compensation.  The relationship was terminated prior to completion of all of the work called for in the Sprints.

21.     Investigation of MarketSphere's breaches of contract has shown that PNM was induced to enter into the MSA, ITA, and Sprint contracts with MarketSphere based on fraudulent misrepresentations (either by commission or omission) made by employees and owners of MarketSphere.  In addition, during the term of performance of these contracts, employees of MarketSphere continued to make fraudulent misrepresentations.  Some of these fraudulent misrepresentations are listed below.

## COUNT I – FRAUDULENT INDUCEMENT

22.     PNM incorporates by reference paragraphs 1 through 21 above as if fully restated in this Count I.

23.     MarketSphere made numerous materially false and misleading misrepresentations and omissions to PNM, including, but not limited to:

A.     Claiming in documents provided to PNM in November 2008 that:

1)     "we are experts" in Hyperion implementation.

2)     "We understand the utilities industry" and have an "exclusive focus on utility companies."

3)      "We are more than technology consultants" and "we have extensive system and process experience and sound insight from other similar projects."

4)      "Our team is committed to bring the right skills, experience and capabilities to PNM, in a completely transparent manner, to serve as your implementation partner on the critical initiative."

5)      "Our partnership provides 'Best Practices' knowledge that will be combined with our understanding of PNM and the platform suite to provide you with the best possible solution – our team will include both application and business process experts."

B.      Claiming in 2008 in multiple versions of the proposed Statement of Work pre-contract that "[w]e will supply an experienced and dedicated staff that will work diligently on project tasks and follow the procedures and documentation standards designed by [PNM] while bringing specific development skills and suggestions from other clients who have implemented similar solutions."

C.      Claiming that it was a "Certified Advantage Oracle Partner" and certified by Oracle to perform the type of work contemplated by the MSA and ITAs.  In fact, an "Oracle Partnership" is not a real partnership, but a sales tool by which MarketSphere sought to obtain service contracts based on its affiliation with Hyperion's manufacturer.  In fact, MarketSphere paid Oracle approximately Ten Thousand Dollars ($10,000) for this sales tool.  In fact, MarketSphere employees assigned to PNM's installation were not Oracle trained and tested in the installation of Hyperion Planning.

D.      Claiming that when PNM's Rob Virden raised a concern about MarketSphere's competence to install Hyperion, MarketSphere's Project Manager, Rocky Williams told PNM's Rob Virden to "quit being so paranoid" in an email on February 6, 2009.  In fact, Rocky Williams and other MarketSphere employees assigned to PNM's installation were insufficiently trained and tested in Hyperion, did not have sufficient familiarity with PNM's budget projections and specifically with "future year projections", and utility rate cases or how Hyperion could be developed to accomplish these tasks.

E.      Failing to disclose to PNM that MarketSphere assigned insufficient personnel resources to perform and supervise the work in the time required by the MSA and ITAs.

F.      Failing to disclose to PNM that the persons it assigned to the project were not properly hired, trained, or supervised before or during this project. More specifically:

1)      MarketSphere's Project Managers, Rocky Williams and Paul Logan, assigned to the PNM installation, did not have the technical skill and utility background to supervise or coordinate the project competently, for example, each failed to reject the Building Requirements and Design documents which were patently defective;

2)      The Subject Matter Expert ("SME"), Bill Harding, who claimed he had related experience at Reliant Energy, did not have adequate communication, technical and utility training or expertise to perform his SME job on PNM's Hyperion Project.

3)      Raj Ranganathan, the person assigned as Developer by MarketSphere was not Oracle certified and, based on what was developed for PNM, did not have a sufficient technical skill and utility background to design and build PNM's Hyperion application and to interact with PNM employees and the SME.

G.      Claiming in contract documents that Hyperion would be prototyped, "placed in front of key stakeholders to get immediate feedback," and successfully tested before delivery to PNM.  (ITA-01, pp. 3-5).

H.      Claiming before ITA-02, ITA-03, and the Sprints were agreed to that MarketSphere was "so close" to completion.

I.      Claiming that ITA-01 failed in substantial part because of PNM's defective work (these claims are set forth in the beginning of ITA-02).

J.      Claiming in Status Reports and conversations in connection with the negotiation and performance of the ITAs and Sprints that the work was closer to completion (e.g. prototypes 80% complete) than it really was and/or omitting to inform PNM that the work was not close to completion (described more fully below).

24.    MarketSphere either knew of or was reckless as to the falsity of the forgoing misrepresentations.

25.    The foregoing misrepresentations were made with the intent to deceive and induce reliance by PNM in entering into contractual relationships with MarketSphere.

26.    PNM was deceived by the foregoing misrepresentations.  In detrimental reliance thereon, PNM was induced by MarketSphere to enter into the MSA and ITAs with MarketSphere.

9

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory and punitive damages in an amount to be proven at trial, interest, attorneys' fees, and costs as permitted by law, rescission of the contracts, and such other and further relief as the Court may direct.

## COUNT II – FRAUD

27.     PNM incorporates by reference paragraphs 1 through 26 above as if fully restated in this Count II.

28.     During the term of the MSA, ITAs and Sprints, MarketSphere made other misrepresentations:

A.      MarketSphere exaggerated ("oversold and underdelivered") the Statement of Work ("SOW") in order to get the PNM contract and to be able to bill large amounts of money for time, travel and materials.  A reasonable review of PNM's proposed use of Hyperion (dimensions, size and complexity), would have shown that MarketSphere could not complete the SOW in six months, that MarketSphere did not have the understanding of PNM's financial forecasting needs and MarketSphere did not have the ability to develop (build) Hyperion consistent with the SOW;

B.      The Hyperion Requirements document, ITA-01, pages 4 and 6, repeated the mistakes that MarketSphere made in the SOW.

C.      MarketSphere knew or recklessly ignored that the Hyperion application could not be delivered in six months to PNM within the limitations of Hyperion and the limited "skill set" of the assigned MarketSphere employees;

D.      The Hyperion Design document called for in ITA-01, pages 4 and 6

purported to be an architectural plan of what MarketSphere would build consistent with the Requirements Document.  In fact, MarketSphere's Design document contains a grossly inadequate description of what was to be built.  MarketSphere knew or recklessly ignored that the MarketSphere developer would not be able to build the Requirements based on this defective Design document, which combined with the designer's lack of knowledge of PNM's financial forecasting needs and her lack of experience in financial forecasting caused MarketSphere not to be able to overcome the defects in this Design document,

E.     MarketSphere continually claimed that it reasonably staffed the project when it knew or recklessly ignored that the assigned MarketSphere employees did not have the expertise to complete the installation contract;

F.     MarketSphere, after claiming it would use its "Best practices knowledge," intentionally failed to provide prototypes, testing templates, issue logs, risk logs and other items to PNM for this installation which were necessary and within the "best practices" of the software installation industry;

G.     MarketSphere, after claiming it would use its "Best Practices Knowledge," intentionally did not seek help from Oracle and or other recognized installers and discouraged PNM from doing so, asserting that it had the skill and ability to complete the job.

H.     MarketSphere's periodic reports contained numerous false and inaccurate statements, including but not limited to the following;

1)     MarketSphere Weekly Status Report, February 16-20, "no issues", prototypes 80% complete, to be finished on 3/9/09;

11

2)    MarketSphere Weekly Status Report, March 11-15, web forms will be done on 5/29, all other items on May 22;

3)    MarketSphere Weekly Status Report, March 23-27, Executive Summary, all target dates will be met;

4)    MarketSphere Weekly Status Report May 25-29, Web Forms 85% complete, Business Rules [Development] Calculations 80% complete;

5)    MarketSphere Weekly Status Report June 8-12, Web Forms 100% complete, all target dates will be met.

I.    MarketSphere, both prior to contracting with PNM on each contract and afterwards, claimed successful installation of Hyperion when in fact it had complaints from other customers not unlike PNM's listed above, that its installations were defective and MarketSphere failed to disclose these complaints to PNM. Examples are Hospira, Orbitz and Walter Energy.

J.    When it was clear that MarketSphere would not be able to perform its contract, it blamed PNM and third parties, such as the manufacturers of the hardware and software when MarketSphere knew or recklessly ignored that the material defect was MarketSphere's lack of skill and understanding PNM's financial forecasting needs and how to develop and produce a tested and fully functional production ready Hyperion product for PNM.    Employees of InfoCrossing and Cognizant redesigned MarketSphere's work and produced a functioning Hyperion Planning Software, developed for PNM's specific needs.

29.    MarketSphere's misrepresentations and omissions were knowingly or recklessly made.

12

30.     The foregoing misrepresentations and omissions were made with the intent to deceive and induce reliance by PNM.

31.     PNM was deceived by the foregoing misrepresentations and omissions relied upon them to its detriment.

32.     As a result of MarketSphere's fraud, PNM suffered damages in a total amount to be proven at trial.

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory and punitive damages in an amount to be proven at trial, interest, attorneys' fees, and costs as permitted by law, and such other and further relief as the Court may direct.

## COUNT III - VIOLATIONS OF THE
## NEW MEXICO UNFAIR TRADE PRACTICES ACT

33.     PNM incorporates by reference paragraphs 1 through 32 above as if fully restated in this Count III.

34.     As described more fully above, MarketSphere made false statements to PNM, including, but not limited to: (a) that it would provide the services contracted for, (b) that it was qualified to perform the services contracted for, and (c) that it would correct any problems with its performance.

35.     MarketSphere's false statements were knowingly made in connection with its sale of services to PNM.

36.     MarketSphere's false statements were made in the regular course of trade or commerce.

37.     MarketSphere's false statements were of the kind which may, tend to, or do mislead any person.

38.     Upon information and belief, MarketSphere willfully engaged in unfair trade practices in violation of 57-12-10 NMSA.

39.     As a result of MarketSphere's violations of the New Mexico Unfair Trade Practices Act, PNM suffered damages in a total amount to be proven at trial.

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory and treble damages in an amount to be proven at trial, interest, attorneys' fees, and costs as permitted by law, and such other and further relief as the Court may direct.

### COUNT IV – NEGLIGENT MISREPRESENTATION

40.     PNM incorporates by reference paragraphs 1 through 39 above as if fully restated in this Count IV.

41.     As described more fully above, MarketSphere made materially false and misleading representations and omissions to PNM, including, but not limited to: (a) that it would provide the services contracted for, (b) that it was qualified to perform the services contracted for, and (c) that it would correct any problems with its performance.

42.     MarketSphere had no reasonable grounds to believe that its materially false and misleading misrepresentations and omissions were true and MarketSphere failed to exercise ordinary care in obtaining and communicating the statements and omissions.

43.     MarketSphere's materially false and misleading misrepresentations and omissions were made with the intent to induce PNM's reliance or with an intent that PNM receive and be influenced by them and it was reasonably foreseeable that PNM would be harmed if the information conveyed was incorrect or misleading.

44. PNM was deceived by the foregoing false and misleading misrepresentations and omissions, relied upon them to its detriment, and suffered damages in a total amount to be proven at trial.

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory damages in an amount to be proven at trial, interest and costs as permitted by law, and such other and further relief as the Court may direct.

## COUNT V – NEGLIGENCE

45. PNM incorporates by reference paragraphs 1 through 44 above as if fully restated in this Count IV.

46. MarketSphere had a duty to adhere to a standard of reasonable care in performing its professional services for PNM.

47. MarketSphere breached its duty of reasonable care owed to PNM.

48. As a result of MarketSphere's breach of its duty of reasonable care, PNM suffered damages in an amount to be proven at trial.

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory damages in an amount to be proven at trial, interest and costs as permitted by law, and such other and further relief as the Court may direct.

## COUNT VI - BREACH OF CONTRACT

49. PNM incorporates by reference paragraphs 1 through 48 above as if fully restated in this Count VI.

50. The MSA, and ITA-01, ITA-02, ITA-03 and Sprints 1 and 2 constitute contracts between the parties.

51.     MarketSphere materially breached the parties' contract by failing to provide the financial planning and forecasting applications in the manner and in the time specified by the parties' contract.   MarketSphere's applications did not provide the functionality required by PNM in the parties' contract.

52.     Section 6.2 of the MSA requires MarketSphere to correct, at its own expense, any problems or damages arising out if its failure to perform the services. Despite PNM affording MarketSphere numerous opportunities to cure the failure to deliver the promised fully functional Hyperion product, MarketSphere failed to do so. MarketSphere's breach and failure to cure its breach required PNM to contract with third parties to cure MarketSphere's deficient performance.

53.     PNM performed its material obligations under the contract between the parties.

54.     Upon information and belief, MarketSphere's breaches of the parties' contract were willful, knowing, reckless, or in bad faith.

55.     As a result of MarketSphere's material breaches of the parties' contract, PNM suffered damages in a total amount to be proven at trial.

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory and punitive damages in an amount to be proven at trial, interest and costs as permitted by law, and such other and further relief as the Court may direct.

### COUNT VII
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

56.     PNM incorporates by reference paragraphs 1 through 55 above as if fully restated in this Count VII.

16

57.     New Mexico law implies a covenant of good faith and fair dealing in every contract.  The implied covenant of good faith and fair dealing requires that neither party to the contract do anything that will injure the rights of the other to receive the benefits of the contract.

58.     MarketSphere breached the covenant of good faith and fair dealing.

59.     Upon information and belief, MarketSphere's breaches of the covenant of good faith and fair dealing were willful, knowing, reckless, or in bad faith.

60.     As a result of MarketSphere's breaches of the covenant of good faith and fair dealing, PNM suffered damages in a total amount to be proven at trial.

WHEREFORE,  PNM  requests  the  Court  to  grant  it  judgment  against MarketSphere for compensatory and punitive damages in an amount to be proven at trial, interest and costs as permitted by law, and such other and further relief as the Court may direct.

## COUNT VIII - BREACH OF WARRANTIES

61.     PNM incorporates by reference paragraphs 1 through 60 above as if fully restated in this Count VIII.

62.     The MSA, and ITA-01, ITA-02, and ITA-03 contain numerous express warranties  by  MarketSphere  concerning  the  nature  of  its  performance  under  the contract and its qualifications and abilities to perform the work.

63.     MarketSphere breached express warranties concerning the nature of its performance under the contract and its qualifications and abilities to perform the work.

64.     Upon information and belief, MarketSphere's breaches of its warranties were willful, knowing, reckless, or in bad faith.

17

65.   As a result of MarketSphere's breaches of express warranties, PNM suffered damages in a total amount to be proven at trial.

WHEREFORE, PNM requests the Court to grant it judgment against MarketSphere for compensatory and punitive damages in an amount to be proven at trial, interest and costs as permitted by law, and such other and further relief as the Court may direct.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a jury trial on all issues, claims, actions, and defenses so triable in this case.


Respectfully submitted,

THOMPSON, HICKEY, CUNNINGHAM,
  CLOW, APRIL & DOLAN, P.A.


By: _____/s/_____
        David F. Cunningham
        Brenden J. Murphy
        460 St. Michael's Dr., Suite 1000
        Santa Fe, NM 87505
        (505) 988-2900 x 107
        *Attorneys for Plaintiff*
        *PNMR Services Company*